# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

LOUIS J. CAPANO, III,

    Plaintiff and
    Counterclaim Defendant,

    v.

DARIN A. LOCKWOOD and
DON A. LOCKWOOD, jointly and
severally,

    Defendants,

    and

DON A. LOCKWOOD,

    Third-Party Plaintiff and
    Counterclaim Defendant,

    v.

LOUIS J. CAPANO, JR.,

    Third-Party Defendant and
    Counterclaim Plaintiff.

C.A. No. 10C-11-228 WCC

Submitted: October 20, 2016
Decided:   May 2, 2017

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

The Court held a three-day bench trial beginning August 16, 2016.

Subsequently the parties filed Proposed Findings of Fact and Conclusions of Law.

The Court has since reviewed the parties' submissions, as well as the transcript of

the bench trial. Based upon this review and the evidence presented at trial, the Court makes the following findings:

## A. FINDINGS OF FACT

1. There is very little overall dispute regarding the facts of this case. In 2004, Defendants Don ("Don") and Darin ("Darin") Lockwood ("the Lockwoods"), together with Wayne Hudson ("Hudson"), purchased interest in two large parcels of farmland outside of Milton, Delaware. The 227 contiguous acres, generally known as "the Rust Farm," were half-owned by the Rust family (or their heirs) with the other half having been donated by the family to the Salvation Army. The purchase price of the Rust family portion of the property was 5.1 million dollars and the Salvation Army parcel was priced at 5.7 million dollars. The sale contracts gave the Lockwoods and Hudson a 120 day due diligence period to study the feasibility of using the property for residential housing. This period was extended several times upon the payment of additional non-refundable deposits. Hudson subsequently withdrew from participating in the purchase, but his farmland, which is located adjacent to the Rust Farm, remained part of the overall land the parties intended to use for their commercial and residential housing project, known as the "Elizabethtown Project." Hudson's withdrawal

2

nevertheless placed all of the financial burden to complete the sale on the Lockwoods who had not previously developed a project of this magnitude.

2. While there is some dispute as to the exact date, sometime in late fall of 2004, Eugene Bayard, Esquire ("Mr. Bayard") contacted Louis Capano, III ("Louis III") to inquire whether he had an interest in participating with the Lockwoods to purchase a large parcel of land outside of Milton, Delaware. The idea proposed was to purchase the land, annex it into the town of Milton, and at least from Louis III's viewpoint, flip the property at that time. While Louis III and his father, Louis J. Capano, Jr. ("Louis Jr.") ("the Capanos"), had some limited business contact with Darin, they were unfamiliar with Don. However, based upon the recommendation of Mr. Bayard, they agreed to participate in financing the deal.

3. To facilitate the transaction, the Lockwoods created an LLC, Lockwood Brothers II, LLC ("LB II, LLC"), with Don and Darin each being a 50% member. The Capanos created Milton Investments, LLC ("MI, LLC") with Louis III and Louis Jr. as equal partners. These two LLCs then became parties in a subsequently formed LLC, North Milton Development Group, LLC ("NMDG"). NMDG would be the entity that would purchase the property and manage its development. The NMDG Agreement called for each member to enter into an

3

Acquisition Loan to purchase the property and further indicated that the two-member LLCs and their principals would serve as guarantors on the Acquisition Loan. Subsequently a 7.13 million dollar Acquisition Loan was made by Wilmington Trust Company with the balance of the purchase price obtained by equal capital contributions by the parties.

4. Execution of the Acquisition Loan documentation and property closing occurred on December 17, 2013. The Rust family, together with Don and Darin Lockwood, were in attendance in addition to Art Lodge ("Mr. Lodge"), the loan officer for Wilmington Trust. The closing documents were executed at the law office of George Smith, Esquire, counsel for the Lockwoods, and were then transported by Mr. Lodge to the Capanos to sign. Louis III executed the documents on behalf of MI, LLC. The 7.13 million dollar promissory note was signed by Don and Darin Lockwood on behalf of LB II, LLC. Louis III signed the note on behalf of MI, LLC. The evidence introduced at trial also reflected that Don, Darin, and Louis III executed Wilmington Trust personal guarantees for the loan.

5. Around the time of the settlement, counsel for the Capanos, Robert Krapf, Esquire, raised the issue of whether there should be a Contribution Agreement between the guarantors of the Acquisition Loan. While the

4

Lockwoods believed it was signed on the date of the closing, emails and communication between counsel for the parties would indicate that it was executed after the settlement and backdated to the settlement date. The Contribution Agreement was signed by the Lockwoods and Louis III. While Louis Jr. did not execute the document, the terms set forth in the Contribution Agreement reflected that he was a guarantor of the Acquisition Loan and the Lockwoods had a right of contribution against him. Testimony also clearly reflects that, unlike the Lockwoods, Louis Jr. and his son conduct and manage all of their joint business ventures as a single corporate entity. As such, both Capanos testified that when they jointly participated in a project, the representations and commitments made by Louis III would have been equally applicable to Louis Jr. In other words, as long as the transaction related to a Capano business venture that both the father and son were involved in, the documents executed by one would be equally binding upon the other. There was no separation of the businesses or of the funds used to support them. In addition, it was only because the bank was satisfied by the strength of the financial status of Louis III, that the bank did not require that Louis Jr. also execute a personal guarantee. This circumstance had no relationship to the land deal, nor did it change the obligations clearly set forth in the NMDG Agreement.

5

6. The Contribution Agreement granted the principals of NMDG the right to seek contribution from one another for monies that they had paid to the bank in excess of their equitable share. While the Lockwoods place significant emphasis on Louis Jr.'s failure to sign the Contribution Agreement, the NMDG Agreement made all principals, including Louis Jr., guarantors of the Acquisition Loan. So the only potential harm to the Lockwoods if they made excessive payments on the loan beyond their equitable interest was that they might be limited to seeking contribution against Louis III and not his father. From the evidence presented, however, it is clear the Lockwoods never made excess contributions that would have implicated their rights under the Contribution Agreement. It appears the only reason the Contribution Agreement was even considered by counsel was that, near the settlement date, Wilmington Trust Company insisted that the Acquisition Loan be a single loan to the LLC and not two separate loans to the Lockwoods and Capanos.

7. After closing, the parties agreed that the monthly interest-only payments on the Acquisition Loan would be paid by capital contributions in the form of cash by MI, LLC and this would be matched by capital contributions by the Lockwoods through Darin's engineering firm, Meridian Enterprises. The accounting of these contributions was done by the Capanos' accountant and this

6

practice continued until 2007. By 2007, the annexation of the property into the town of Milton had failed, but the necessary rezoning had been approved by Sussex County. In the four years since the loan was executed, the contribution to the capital account by the Capanos had exceeded the services provided by the Lockwoods' engineering firm by more than $400,000. To rectify this situation, the parties, through their representative LLCs, borrowed an additional one million dollar working capital loan ("Working Capital Loan"). From the Working Capital Loan, the Capano entities were repaid $400,000 to balance the capital contributions and the remaining portion was used to pay interest on both the original Acquisition Loan and the Working Capital Loan, which was approximately $30,000 a month. The interest payments on both loans continued to be made through the Working Capital Loan until the funds were exhausted in July of 2008. However, the parties continued to pay their share of the interest, with the Lockwoods making cash payments through Meridian Enterprises, and Louis III making the Capanos' payments from his personal banking accounts. This arrangement continued into late summer of 2010. Beginning in August of 2010, the Lockwoods stopped making any payments toward the loans. All payments made thereafter came from accounts maintained by Louis III, up until

April 2011. The payments for the Acquisition Loan from September 2010 to April 2011, were as follows:

| Bill Date | Due Date | Loan 9001 | Paid Date | L3 Check |
|---|---|---|---|---|
| 08/20/10 | 09/01/10 | 24,558.79 | 09/29/10 | 24,558.79 |
| 09/20/10 | 10/01/10 | 23,766.57 | 10/29/10 | 23,766.57 |
| 10/21/10 | 11/01/10 | 24,558.78 | 11/10/10 | 24,558.78 |
| 11/19/10 | 12/01/10 | 23,766.57 | 12/10/10 | 23,766.57 |
| 12/21/10 | 01/01/11 | 24,558.79 | 01/13/11 | 24,558.79 |
| 01/21/11 | 02/01/11 | 24,558.78 | 02/10/11 | 24,558.78 |
| 02/18/11 | 03/01/11 | 22,182.13 | 03/10/11 | 22,182.13 |
| 03/24/11 | 04/01/11 | 24,558.79 | 04/14/11 | 24,558.78 |
| | | $192,509.20 | | $192,509.20 |

9. From the summer of 2010 to the spring of 2011, there was no formal default or demand initiated by the bank. However, the evidence established that the loan officers at Wilmington Trust Company were under a great deal of pressure during this time to keep loans current since the bank was being investigated by the Federal Reserve. This resulted in regular contact by Jeremy J. Abelson ("Mr. Abelson"), the then-loan manager for NMDG to make interest payments when they were late. These requests were made directly to the Capanos as Mr. Abelson was also the primary loan manager for the Capano entities. The Capanos considered the loan manager's request a demand, which, if not honored, would jeopardize the status of the loans. The evidence also reflects that during

8

the time frame in which Mr. Abelson was making these demands, no payments were made by either Don or Darin Lockwood on the loans.

10. In October of 2011, NMDG agreed to sell the Rust Farm to J. Carlton Wells & Sons, Inc. for 2.6 million dollars. M&T Bank, which had, by that point, purchased Wilmington Trust, agreed to the sale which resulted in an overall loan deficiency of $5,529,929. Testimony revealed that Louis III executed a note for 50% of the deficiency in the amount of $2,923,536.57. Don Lockwood negotiated with the bank for a global settlement of various loans that appears to have resulted in M&T forgiving the deficiency as to his equity interest. There was no testimony as to the status of the loan deficiency with regard to Darin Lockwood, as he failed to participate in these proceedings and default has been entered as to his liability under the Contribution Agreement.

11. On November 27, 2010, Louis III filed this action for contribution. In January of 2014 the Court granted Plaintiff's Motion for Summary Judgment in part. The Court's decision was appealed and subsequently reversed and remanded by the Delaware Supreme Court on the grounds that a factual dispute remained as to whether having all four parties sign the Contribution Agreement was a condition precedent to the contract formation. Thereafter, Louis III filed an Amended Complaint to add a claim for equitable right of contribution. Don

Lockwood answered and filed an Amended Counterclaim and Third-Party Complaint asserting that he was misled into entering the agreement with the Capanos by representations that Louis Jr. would also guarantee the Acquisition Loan. Don Lockwood asserts that, absent such assurances, he would not have entered into the NMDG Agreement. As a result, Don seeks damages in the amount of $1,515,000, which allegedly represents his investment in the project. Louis III answered and filed a Counterclaim asserting he had been defrauded into participating in the project, as the principal purpose of Darin Lockwood in obtaining the land was to create potential sewer demands to which he was able to sell a spray irrigation site to Artesian resulting in significant profit to him. Louis III claims he suffered damages in an amount exceeding five million dollars. The Court subsequently issued a Memorandum Opinion on various Motions to Dismiss on August 21, 2015 and a Letter Opinion on similar motions on August 12, 2016.

## B. CONCLUSIONS OF LAW

12. From August of 2010 to April of 2011, Louis III paid interest on the Acquisition Loan in the amount of $192,509.20. During this time frame, no payments were made by either Don or Darin Lockwood toward the Acquisition Loan. Under the Contribution Agreement executed by the Lockwoods and Louis III, the Lockwoods' equitable contribution would be $96,254.60. Since each of

the principals were separately obligated, Don and Darin's contribution amount would be $48,127.30 each. The Court finds Louis III has met his burden of establishing this obligation by a preponderance of the evidence and will rule in his favor as to damages for the above amounts.

13. The Court finds that, since the Contribution Agreement was not agreed to or executed until after the loan settlement had occurred, it was not a condition precedent to NMDG's purchase of the Rust property or the execution of the Acquisition Loan agreement. It also finds that the payment demands made by the loan officer of Wilmington Trust were sufficient to activate the contribution obligations.

14. The Court finds that, in spite of Louis Jr. not executing the Contribution Agreement or a bank personal guarantee document, the NMDG made him personally obligated for the Acquisition Loan of 7.1 million dollars. The only possible effect of Louis Jr. not executing the Contribution Agreement was that, had the Lockwoods paid interest on the Acquisition Loan beyond their one half equitable obligation, there is an argument that they could not have obtained contribution from Louis Jr. However, if that issue was before the Court, it would have found, based on the evidence presented by both Louis Jr. and Louis III, concerning the manner in which the Capanos operated their business, a

11

contribution right would have been available against Louis Jr. This issue is moot, however, since the Lockwoods never made payments that would have activated the contribution obligation.

15. The Court finds that the basis for Don Lockwood's Amended Counterclaim and Third Party Complaint is that, if he had known that Louis Jr. had not personally guaranteed the Acquisition Loan, he would have not entered into this business relationship. First, the Court finds this representation suspect at best. Don and Darin had paid a significant down payment to purchase the land and were desperately looking for financial assistance once Hudson had decided to forego participating in its purchase. The Capanos provided the Lockwoods the financial ability to purchase land and development expertise to allow them to build a community named after the Lockwoods' grandmother. However, more significant, the basic premise that Louis Jr. had not guaranteed the Acquisition Loan is simply not supported by the evidence. While the bank may not have required a separate guarantee document, the NMDG Agreement did place this obligation upon Louis Jr. The document stated:

> In order to purchase the Property, each of the Members shall enter into a loan or loans (collectively, the "Acquisition Loan") with Wilmington Trust Company, on terms and conditions determined by that Member, to be secured by the Property, and shall contribute the proceeds to the Company, which shall fund all of the

costs of closing. Lockwood and Investments, and the **principals of each**, shall only be guarantors of the Acquisition Loan entered into by that Member, but not any other Acquisition Loans. Any costs of the Company Approved by the Managers for closing under the Purchase Agreements in excess of the Acquisition Loan shall be paid by Lockwood and Investments, *pro rata*, as their respective Initial Capital Contributions.

The Court finds this provision of the NMDG Agreement provided Don Lockwood all of the assurances he required to proceed forward and the Capano entities would be, and have been, liable for their half of the Acquisition Loan. As such, the evidence does not support the allegations contained in Don Lockwood's Counterclaim and Third Party Complaint and the asserted damages will not be ordered by the Court.

16. Finally, the Court finds the Capanos have failed to present sufficient evidence that they were defrauded by Darin Lockwood into participating in the land acquisition. They assert that the principal purpose of Darin Lockwood getting them involved was so he could create a sewer demand and subsequently sell land for a spray irrigation sight to Artesian. There has simply been no evidence presented to the Court to support this contention.

17. The simple truth here is that the parties entered into an agreement to buy and subsequently develop the largest contiguous piece of land for

13

development at the time in Sussex County. When the purchase occurred, there was a significant housing demand in Sussex County, but by the time the rezoning and engineering was completed, the economic landscape had taken a drastic turn for the worse and this real estate "boom" had ceased. Bad timing and a diminished demand for housing led to the demise of this project and nothing else.

18. As such, in spite of counsel's efforts, this case returns to what it has always been, a case relating to contribution for interest paid beyond the equitable share of the Capanos. The Court finds Louis III has established this claim by a preponderance of the evidence and orders judgment in the amount of $96,254.60. This amount is to be divided equally between Don and Darin Lockwood in the amount of $48,127.30 each. The Court finds all other claims have not been established by a preponderance of the evidence and no damage award is appropriate for those allegations.

IT IS SO ORDERED.

Judge William C. Carpenter, Jr.

14